# EXHIBIT 35

```
 1                    EDMUND  ELDER,  JR.

 2             UNITED  STATES  DISTRICT  COURT

 3            FOR  THE  DISTRICT  OF  NEW  JERSEY

 4    --------------------------------------------------------

 5    OREXO AB,

 6                    Plaintiff,

 7        -vs-                     Civil Action No. 3:11-cv-3788

 8    MYLAN  PHARMACEUTICALS  INC.
      and MYLAN INC.,
 9
                      Defendants.
10    --------------------------------------------------------

11

12

13             Video  examination  of  EDMUND  J.  ELDER,  JR.,

14    taken  at  the  instance  of  Plaintiff,  under  and  pursuant  to

15    the  Federal  Rules  of  Civil  Procedure,  before

16    JESSICA  R.  WAACK,  Certified  Realtime  Reporter,  Registered

17    Diplomate  Reporter,  Certified  Shorthand  Reporter  and

18    Notary  Public  in  and  for  the  State  of  Wisconsin,  at

19    Perkins  Coie,  One  East  Main  Street,  Suite  201,  Madison,

20    Wisconsin,  on  Wednesday,  November  14,  2012,  commencing  at

21    10:52  a.m.  and  concluding  at  2:57  p.m.

22

23

24

25    Job No. 55525
```

1                          EDMUND ELDER, JR.

2          your opinion of what the term "ordered mixture"

3          means in the '910 patent?

4     A    I believe I summarized that as part of -- yeah, as

5          what I said there.

6     Q    Okay.  And, now, I'm looking at paragraphs 26, you

7          said, right? 27 and 30?

8     A    That's correct.

9     Q    Right.  When I look at those three paragraphs, I

10         don't see there references to any of the

11         specification of the '910 patent, right?

12    A    Well, in 30 I refer to the claims of the patent.

13         And in 26 -- I mean, Nystrom is referred to in the

14         specification of the '910 patent.  So it is

15         incorporated by reference, certainly.

16    Q    So is it your --

17    A    In --

18    Q    -- your opinion --

19              MR. HOCHSTETLER:  Errol.  Errol, you

20         interrupted him.  You did interrupt him.

21    BY MR. TAYLOR:

22    Q    Is it your opinion that the ordered mixture in the

23         Nystrom patent is identical to the ordered mixture

24         in the '910 patent?

25              MR. HOCHSTETLER:  Objection.

1                    EDMUND ELDER, JR.

2                    THE WITNESS:  I don't believe they're

3          identical, per se.  I mean, they're -- the '910

4          patent refers to the ordered mixture in the

5          Nystrom patent.

6                    And there are some differences, I

7          believe, that are pointed out elsewhere in the

8          expert report regarding differences between them

9          in terms of -- that the '910 patent actually

10         indicates that it's an improvement upon Nystrom.

11         And that '910 is focused on sublingual tablets as

12         opposed to Nystrom that does not talk about that.

13                   And then, also, the bio/mucoadhesive is

14         not indicated specifically in the Nystrom patent

15         or application.

16    BY MR. TAYLOR:

17    Q    Right.  The '910 patent includes a bioadhesive in

18         the ordered mixture while Nystrom does not,

19         correct?

20                   MR. HOCHSTETLER:  Objection.

21                   THE WITNESS:  I believe, in general

22         terms, Nystrom just does not refer specifically to

23         bioadhesive -- or bio/mucoadhesive agent.

24    BY MR. TAYLOR:

25    Q    And the '910 patent does?

1              EDMUND ELDER, JR.

2        and construe a definition of the term.

3    Q   I know.  But you just said you had an

4        understanding of what it meant based on your

5        general experience.  What was that understanding?

6    A   I said I have a general understanding of the term

7        "treatment" in terms of how I've used it in my

8        practice of pharmacy, but I did not assess its

9        definition in the context of the patent.

10   Q   Okay.  What is that general understanding that you

11       have of the term "treatment" as you've used it in

12       the context of your practice of pharmacy?

13   A   In pharmacy, the term "treatment" would be the use

14       of -- or the -- utilizing drugs to improve the

15       health of patients.

16   Q   And there was another term that the parties

17       apparently have a disagreement on, and that is the

18       effective amount of at least one pharmaceutically

19       active agent.  When you read that term in the

20       claims, did you understand what it meant?

21   A   Again, I was not asked to give an opinion on that

22       and would not have an opinion on it without

23       assessing it further.  And, I mean, I would have a

24       general understanding based on my involvement in

25       pharmacy practice.

Page 43

1                    EDMUND ELDER, JR.

2  Q    And, again, what is your general understanding of

3       the meaning of that term based on your experience

4       in pharmaceutical practice?

5  A    I mean, certainly it's not, you know, relevant to

6       the interpretation within this patent, because I

7       haven't asked -- been asked to do that.

8               But it would be -- the effective amount

9       would be the amount that would provide a

10      therapeutic effect.

11 Q    Now let's go back to your declaration.  And on

12      page 31 -- and we discussed this briefly a few

13      months ago when we were talking about your

14      understanding of the '910 patent.

15 A    Where are you directing me again?

16 Q    Paragraph 31.

17 A    Paragraph 31.

18              MR. HOCHSTETLER:  Objection.

19 BY MR. TAYLOR:

20 Q    And you mentioned in that paragraph that the '910

21      patent states that it is an improvement upon the

22      prior art ordered mixture as described in Nystrom.

23      Do you see that?

24 A    Yes.

25 Q    Then you go on to point out two differences that

Page 45

```
 1                    EDMUND ELDER, JR.
 2  Q    I'm right -- I'm reading that correct?
 3                 MR. HOCHSTETLER:  No, you're not.
 4                 MR. TAYLOR:  Please don't interrupt me.
 5       It's not an objection to say I'm not reading this.
 6       I mean, it's just improper.  Stop it.
 7                 MR. HOCHSTETLER:  Please read it
 8       accurately.
 9  BY MR. TAYLOR:
10  Q    Will you answer my question?
11  A    What was your question?
12  Q    You state that the '910 patent states that it's an
13       improvement over the Nystrom prior art ordered
14       mixture, right?
15  A    I indicate that the '910 patent indicates that
16       it's an improvement upon the prior art ordered
17       mixture as described in Nystrom.
18  Q    Right.  Now, was Nystrom the first reference to
19       describe an ordered mixture?
20  A    I don't recall if it was the first reference or
21       not.
22  Q    Do you know whether there was such a thing as an
23       ordered mixture before it was mentioned by Nystrom
24       in this -- the Nystrom publication?
25  A    Meaning, in general terms, ordered mixture is not
```

Page 46

1              EDMUND ELDER, JR.

2       a term that's used commonly in pharmaceutical

3       formulations.

4              We typically would deal with random

5       mixtures.  And so -- I mean, I haven't studied

6       extensively the literature as to where the term

7       originated.

8  Q    Well, do you know whether the term "ordered

9       mixture" was used by others prior to Nystrom in

10      the '725 Nystrom publication?

11  A   Off the top of my head, I don't know if it was

12      used prior to that.  I know there are some other

13      references regarding ordered mixtures and related

14      terms, but I don't know when they came out as

15      compared to when Nystrom was filed.

16  Q   So, in your opinion, you relied on the ordered

17      mixture in Nystrom as the definition of an ordered

18      mixture?

19  A   The patent specifically refers to that as an

20      ordered mixture on which it provides some

21      improvement.

22  Q   Okay.  Where --

23  A   So it is part of --

24  Q   Where is that in the patent?

25              MR. HOCHSTETLER:  I object to your

1                    EDMUND ELDER, JR.

2       about the, "Still further, that the composition

3       comprises an ordered mixture of one or more

4       bioadhesive, mucoadhesive substances coated with

5       the pharmaceutically active agent in a fine

6       particulate form."

7                    And then it goes on from there into the

8       section that we talked about regarding Nystrom.

9    BY MR. TAYLOR:

10   Q   Now, does this term "ordered mixture" have an

11       ordinary meaning outside of the Nystrom reference

12       or the '910 patent?

13   A   As I indicated earlier, I believe that the term is

14       not used often in the -- in pharmaceutical

15       formulations.  We typically use random mixtures,

16       which are very different.

17   Q   But that's actually not my question.  Does it have

18       an ordinary meaning?

19                    MR. HOCHSTETLER:  Objection.

20                    THE WITNESS:  You mean in terms of

21       the -- interpreting the patent, we need to use the

22       information that's provided in the specification.

23   BY MR. TAYLOR:

24   Q   Yeah, I know that.  But my question is:  Does the

25       term have an ordinary meaning?  Yes or no.

Page 60

1                     EDMUND ELDER, JR.

2          understood that ordered mixing wasn't necessarily

3          limited to an active ingredient and a carrier,

4          correct?

5                     MR. HOCHSTETLER:  Objection.

6                     THE WITNESS:  I mean, this -- like I

7          said, it's the introduction of the concept, and

8          it's a theoretical assessment.

9                     And, in fact, they say that it -- not

10         that these are absolute processes, but that it's

11         how it may be possible, how such processes are

12         possible.

13    BY MR. TAYLOR:

14    Q    Is it your -- is it your view as you sit here

15         today that ordered mixtures are limited to only

16         mixtures of active ingredients and carriers?

17                    MR. HOCHSTETLER:  Objection.

18                    THE WITNESS:  In the -- in the whole

19         world of things, they aren't necessarily limited;

20         however, in terms of the interpretation of the

21         '910 patent, it specifically indicates how they're

22         to be used.

23    BY MR. TAYLOR:

24    Q    And in the '910 patent, there is a provision for

25         including the bioadhesive in the ordered mixture,

Page 61

1                    EDMUND ELDER, JR.

2         right?

3    A    The claim of bioadhesive agent is part of the '910

4         patent.

5    Q    In the ordered mixture?

6    A    That's correct.

7    Q    Now, when you read the patent -- and I assume you

8         read it as a person of ordinary skill in the art

9         at the time of the filing would have read the

10        patent, right?

11   A    I read it as to whom the patent was directed at

12        the time it was filed.

13   Q    And the patent is directed to a person of ordinary

14        skill, correct?

15   A    It's directed to a formulator with a certain

16        amount of experience.

17   Q    Right.  And that is what we call the person of

18        ordinary skill in the art.  Do you understand

19        that?

20   A    That is a legal term, I guess.

21   Q    Okay.

22   A    But, I mean, I look at where is the patent

23        directed in terms of the claim construction.

24   Q    Right.  And when you read the patent, did you

25        conclude that a person of ordinary skill, this

Page 62

1                    EDMUND ELDER, JR.

2          person that you mentioned, reading the patent,

3          would have been able to make an ordered mixture of

4          the materials described in the patent?

5     A    I believe my assessment of the patent is that,

6          yeah, a formulator should be able to reduce it to

7          practice.

8     Q    Now, one of the things that the patent talks about

9          is ensuring that the bioadhesive agent is adhered

10         to the surfaces of the carrier, right?

11    A    It talks about that, yes.

12    Q    And one of the ways to do that is to create an

13         ordered mixture, correct?

14    A    That's part of the definition of the ordered

15         mixture is that the drug as well as the bio --

16         mucobioadhesive is adhered to the surface of the

17         carrier particle.

18    Q    And the bioadhesive is -- well, strike that.

19              Now, have you ever had the occasion to

20         prepare an ordered mixture yourself?

21    A    I believe the work I did for my doctoral

22         dissertation is similar to what's being described

23         as an ordered mixture.  I did not use that term in

24         any way during the time.

25              But, basically, I was trying to get a

Page 63

1                        EDMUND ELDER, JR.

2          layered coating of a hydrophobic material on the

3          surface of drug particles.

4     Q    And what processes did you use to get that

5          material in a layered coating on these materials?

6     A    I used a dry mixing process with varying levels of

7          the coating material to see what theoretical

8          amounts were required to provide adequate

9          controlled release in this particular instance.

10    Q    Are there various methods that a formulator can

11         use to prepare an ordered mixture?

12                   MR. HOCHSTETLER:  Objection.

13                   THE WITNESS:  In the concept of ordered

14         mixing, as it's described, is really just a

15         mixing -- or, I guess, using an ordinary mixing

16         process to get the particles to adhere to the

17         surface.

18    BY MR. TAYLOR:

19    Q    Uh-huh.  I mean, are there other ways to do that,

20         apart from using an ordinary mixing process?

21                   MR. HOCHSTETLER:  Objection.

22                   THE WITNESS:  There -- the formulator

23         has a number of processes available.  Whether they

24         would achieve an ordered mixture or not would

25         require sufficient experimentation to be able to

Page 64

1                        EDMUND ELDER, JR.

2          determine that.

3    BY MR. TAYLOR:

4    Q    Now, when you looked at the '910 patent and the

5         definition of "ordered mixture," was that ordered

6         mixture in the patent process dependent?

7                    And by that, you know, I don't mean to

8         be confusing.  Would it matter how the formulator

9         made that ordered mixture; if he used one of

10        these, you know, various procedures that you just

11        mentioned to come to --

12   A    As I indicated previously, most mixing that's done

13        to prepare pharmaceutical formulations is a random

14        type of mixing.

15   Q    Uh-huh.

16   A    And so it's not routine that one tries to achieve

17        an ordered mixture.

18   Q    Yeah, I know.  But my question was a little

19        different than that.

20                   Someone makes an ordered mixture, but

21        they use something other than a dry mixing

22        process.  Would that matter in your interpretation

23        of the '910 patent?

24   A    Anytime one -- you know, in the formulation area,

25        it's very difficult to separate formulation and

Page 67

1              EDMUND ELDER, JR.

2   Q   And then in the real world, that ordered mixture

3       would be tableted with other tableted excipients,

4       right?

5   A   I think the composition could include the

6       tableting as well.

7   Q   Right.  The ordered mixture could include the

8       tableting excipients as well?

9   A   No.  The ordered mixture is specific to the

10      bio/mucoadhesive agent, the pharmaceutically

11      active agent and the carrier particles in terms of

12      the mixture.  That can then be incorporated into

13      the overall composition being the tablet.

14  Q   Okay.  That's, I think, what I meant.  I think

15      we're saying the same thing.

16              Now, when this claim talks about

17      essentially water-free, what's it referring to?

18  A   It's referring to the composition of the ordered

19      mixture being essentially water-free.

20  Q   Okay.  Do those other things that go into the

21      pharmaceutical composition also need to be

22      essentially water-free?

23  A   In the event that they're not, they could impact

24      as to whether you have an ordered mixture anymore.

25  Q   So is that a yes?

1                    EDMUND ELDER, JR.

2          of ordinary skill in the art would appreciate that

3          microcrystalline cellulose does not exhibit

4          bio/mucoadhesive properties."  Do you see that?

5    A     Yes.

6    Q     And do you agree with that statement?

7    A     Yes, I do.

8    Q     And it goes on to say that, "While

9          microcrystalline cellulose is in the

10         specification, that the applicants have amended

11         the specification and the claims to correct this

12         obvious error"?

13                   MR. HOCHSTETLER:  Objection.

14   BY MR. TAYLOR:

15   Q     Do you see that?  Do you see that?

16   A     Yes.  They amended the claim to remove

17         microcrystalline cellulose.

18   Q     Now, did you find an amendment to the claims or

19         specification where the parties -- where the

20         inventors removed polyvinylpyrolidone as a

21         bioadhesive agent?

22   A     I don't believe they had it in there.  I mean,

23         it's not in there as a mucobioadhesive, so it

24         wasn't there to remove in that perspective.

25                   But it's certainly not utilized in that

1                          EDMUND ELDER, JR.

2              way.  And it's also included in their definition

3              of a disintegrant, which is its usual use.

4      Q       Now, do you know the reasons why the inventors

5              argued that their invention, the '910 inventions,

6              were patentable over the Nystrom prior art?

7      A       I don't recall the specifics on that.

8      Q       Go to page 200 of the file history, ORM200.  And

9              you see there is -- that is the second page of the

10             response after final rejection?

11     A       Yes.

12     Q       And I believe it's dated January 15, 2004?

13     A       That's correct.

14     Q       And you see at the bottom of page 200 going over

15             to 201, there is a discussion of what was noted

16             during an interview with the examiner regarding

17             Nystrom and its differences from the '910 patent.

18             Do you see that?

19     A       So specifically you're referring to this

20             paragraph, the last paragraph --

21     Q       Yeah, I'll tell -- I'll just --

22     A       Okay.

23     Q       -- try to orient you now.  I'm referring to the

24             bottom of page 2 over into page 3, which is really

25             most of page 3.  There's a discussion there of

Page 106

1                      EDMUND ELDER, JR.

2          bio and mucoadhesive material, the claimed

3          composition enables the pharmaceutically active

4          agent to be absorbed in the mucosal lining of the

5          oral cavity?  And I'm paraphrasing.

6      A   I see that.

7      Q   And you agree with that as a teaching of the '910

8          patent?

9                      MR. HOCHSTETLER:  Objection.

10                     THE WITNESS:  Well, here I believe the

11         composition they're referring to is the final

12         dosage form.

13                     And the ordered units would be the

14         ordered mixture, which is described in the

15         previous sentence, which get dispersed to then

16         provide the absorption of the drug.

17     BY MR. TAYLOR:

18     Q   Right.  And that's provided because of the

19         inclusion of the bioadhesive agent in the ordered

20         mixture?

21                     MR. HOCHSTETLER:  Objection.

22                     THE WITNESS:  That's what the ordered

23         mixture is there to do is to provide both the

24         bioadhesive and the drug, which then holds the

25         drug in close -- in -- against the mucosal

1                    EDMUND ELDER, JR.

2          material.

3     BY MR. TAYLOR:

4     Q    Now, it goes on to say in the next paragraph that,

5          "Nystrom," and I'm quoting here, "fails to teach a

6          bioadhesive and/or mucoadhesive component mainly

7          adhered to the surface of a carrier component."

8          Do you see that?

9     A    Yes.

10    Q    Would you agree with that?

11    A    I believe that's correct.  That's a difference

12         between the '910 and the Nystrom, yes.

13    Q    Okay.  Now, if you refer to the '910 patent.  And

14         this Ac-Di-Sol component, right? it's used in '910

15         as both a disintegrant and a bioadhesive, right?

16    A    Uh-huh.  That's what they're saying in the '910

17         patent.

18    Q    And in the '910 patent, it's formulated in such a

19         way that the Ac-Di-Sol is primarily adhered to the

20         surfaces of the carrier, right?

21                   MR. HOCHSTETLER:  Objection.

22                   THE WITNESS:  I mean, it's certainly

23         mixed in there with the carrier that has the drug

24         added to it as well.

25    BY MR. TAYLOR: